# 14-1741

In the

# United States Court of Appeals
## For the Second Circuit



OKSANA S. BAIUL and OKSANA, LTD.,

*Plaintiffs-Appellants,*

v.

STEPHEN DISSON and DISSON SKATING, LLC,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

TACOPINA SEIGEL & TURANO, P.C.
*Attorneys for Defendants-Appellees*
275 Madison Avenue, 35th Floor
New York, New York 10016
(212) 227-8877

# DEFENDANTS-APPELLEES'
# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

      The undersigned counsel for DISSON SKATING, LLC (a private non-governmental party) certifies that the following are corporate parents, affiliates and/or subsidiaries of said party, which are publicly held: NONE.

Dated:      New York, New York
           November 20, 2014

               Yours, etc.,
               TACOPINA SEIGEL & TURANO, P.C.

          By:        /s/ Joseph Tacopina     
               Joseph Tacopina, Esq.
               Matthew G. DeOreo, Esq.
               275 Madison Ave., Fl. 35
               New York, New York 10016
               Tel: (212) 227-8877
               Fax: (212) 619-1028
               *Attorneys for Defendants-Appellees*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Baiul Hired Steve Martin as Her Agent. . . . . . . . . . . . . . . . . . . . . . 5

    Baiul Agreed to Perform in Two of Disson PA's Shows. . . . . . . . . . . 6

    Baiul Backed out of the Two Disson PA Shows. . . . . . . . . . . . . . . . . 9

    Disson PA's Alleged Use of Baiul's Name and Likeness. . . . . . . . . . 10

    The February 2, 2012 NBC Press Release. . . . . . . . . . . . . . . . . . . . 11

    The Entertainment Hotline Posting. . . . . . . . . . . . . . . . . . . . . . . . . 13

    The Radio Internet Postings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    "Background Information" Decks . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Stride Rite Proposal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Stouffer's Proposal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Background Information Sent to the BI-LO Center. . . . . . . . . . . . . . 17

    The Fact Sheets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    Print and Radio Advertisements for These Two Shows. . . . . . . . . . . 19

The Alleged Defamatory Statements. . . . . . . . . . . . . . . . . . . . . . . . . . 19

First and Ninth Causes of Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Second and Tenth Causes of Action. . . . . . . . . . . . . . . . . . . . . . . . . . 21

Third and Eleventh Causes of Action. . . . . . . . . . . . . . . . . . . . . . . . . 21

Fourth and Twelfth Causes of Action. . . . . . . . . . . . . . . . . . . . . . . . . 22

Fifth and Thirteenth Causes of Action. . . . . . . . . . . . . . . . . . . . . . . . 23

Sixth and Fourteenth Causes of Action. . . . . . . . . . . . . . . . . . . . . . . 25

Seventh and Fifteenth Causes of Action. . . . . . . . . . . . . . . . . . . . . . . 25

Eighth and Sixteenth Causes of Action. . . . . . . . . . . . . . . . . . . . . . . 27

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

POINT I      New York Law Applies To Appellants' Defamation
             Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

POINT II     Most Of Appellants' Defamation Claims Are Barred By
             The  Absolute Litigation Privilege. . . . . . . . . . . . . . . . . . . 34

             New York Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

             Pennsylvania Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

POINT III    Many Of The Claims Are Based Upon Alleged Expression
             Of Opinion Or Rhetorical Hyperbole Table Of
             Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

POINT IV     The Alleged Statement That Baiul Once Did Not Show Up
             Because She Was Shopping Is Barred By The Single
             Instance Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

iii

POINT V    Baiul Is A Public Figure And Failed To Prove Actual Malice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

## <u>TABLE OF AUTHORITIES</u>

*AroChem Intern., Inc. v. Buirkle*, 968 F.2d 266 (2d Cir. 1992).. . . . . . . . . . . 28

*Aronson v. Wiersma*, 65 N.Y.2d 592 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 45

*Baiul v. NBC Universal Media, LLC*, No. 13-cv-02205-KBF (S.D.N.Y.). . . . 30

*Biro v. Conde Nast*, No. 11 CIV. 4442, 2013 WL 3948394
    (S.D.N.Y. Aug. 1, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

*Cashdollar v. Mercy Hosp. of Pittsburgh*, 595 A.2d 70
    (Pa. Super. Ct. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Condit v. Dunne*, 317 F. Supp. 2d 344 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . 31

*Davis v. Costa-Gavras*, 580 F. Supp. 1082 (S.D.N.Y. 1984). . . . . . . . . . . . . 33

*Davis v State Farm Ins.*, No. 11-CV-3401, 2012 WL 6524120
    (E.D. Pa. Dec. 14, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Depuy v. St. John Fisher Coll.*, 129 A.D.2d 972 (4th Dep't 1987) . . . . . . 44, 52

*Dongguk Univ. v. Yale Univ.*, No. 12-2698-CV, 2013 WL 4106644
    (2d Cir. Aug. 15, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Drug Research Corp. v. Curtis Pub. Co.*, 7 N.Y.2d 435 (1960) . . . . . . . . . . . 47

*Fetter v. N. Am. Alcohols, Inc.*, No. 06-4088, 2007 WL 551512
    (E.D. Pa. Feb. 15, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*First Lehigh Bank v. Cowen*, 700 A.2d 498 (Pa. Super. Ct. 1997).. . . . . . . . 43

*Fishof v. Abady*, 280 A.D.2d 417 (1st Dep't 2001) . . . . . . . . . . . . . . . . . . . . 34

*Friedman v. Alexander*, 79 A.D.2d 627 (2d Dep't 1980). . . . . . . . . . . . . . . . 40

v

*Friedman v. Israel Labour Party*, 957 F.Supp. 701 (E.D. Pa. 1997). . . . . . . .  43

*Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc.*, 489 A.2d 1364
    (Pa. Super. Ct. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

*Grass v. News Group Publications, Inc.*, 570 F.Supp. 178
    (S.D.N.Y. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Howard v. Alford*, 229 A.D.2d 996 (4th Dep't 1996). . . . . . . . . . . . . . . .  43, 45

*Hudak v. Times Pub. Co., Inc.*, 534 F.Supp.2d 546 (W.D. Pa. 2008). . . .  41-42

*Hudson v. Goldman Sachs & Co*, No. 600502/00, 2000 WL 35928688
    (Sup. Ct. N.Y. Co. Dec. 18, 2000). . . . . . . . . . . . . . . . . . . . . . . . . . .  35, 40

*Hudson v. Goldman Sachs & Co.*, No. 600502/00, 2002 WL 34338583
    (Sup. Ct. N.Y. Co. Apr. 3, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

*Hudson v. Goldman Sachs & Co., Inc.*, 304 A.D.2d 315 (1st Dept 2003). . . .  40

*Hussey v. New York State Dept. of Law/Off. of Atty. Gen.*, 933 F.Supp.2d 399
    (E.D.N.Y. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

*Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348 (S.D.N.Y. 1998). . . . .  32-33

*Keough v Texaco Inc.*, 97 CIV. 5981 LMM, 1999 WL 61836
    (S.D.N.Y. Feb. 10, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Kolchinsky v. Moody's Corp.*, No. , 2012 WL 639162
    (S.D.N.Y. Feb. 28, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

*Kryeski v. Schott Glass Tech., Inc.*, 626 A.2d 595 (Pa. Super. Ct. 1993). . . . .  45

*La Luna Enterprises, Inc. v. CBS Corp.*, 74 F. Supp. 2d 384
    (S.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

*Larson v. Albany Med. Ctr.*, 252 A.D.2d 936 (3d Dep't 1998) . . . . . . . . . . .  47

*Lee v. Bankers Trust Co.*, 166 F.3d 540 (2d Cir 1999) . . . . . . . . . . .  28, 30-31

*Levin v. McPhee*, 917 F. Supp. 230 (S.D.N.Y. 1996),  *aff'd*, 119 F.3d 189
    (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

*Lipin v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa.*, 202 F.Supp.2d 126,
    (S.D.N.Y. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34-35

*Machleder v. Diaz*, 801 F.2d 46 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . .  32

*Mosesson v. Jacob D. Fuchsberg Law Firm*, 257 A.D.2d 381
    (1st Dep't 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

*Mulder v. Donaldson, Lufkin & Jenrette*, 208 A.D.2d 301 (1st Dep't 1995)..  35

*Oweida v. Tribune-Review Pub. Co.*, 599 A.2d 230 (Pa. Super. Ct 1991).. . .  41

*Pawlowski v. Smorto*, 588 A2d 36 (Pa. Super. Ct. 1991) . . . . . . . . . . . . . . . .  42

*Pelagatti v. Cohen*, 536 A.2d 1337 (Pa. Super. Ct. 1987). . . . . . . . . . . . . . .  42

*Penn Warranty Corp. v. DiGiovanni*, 10 Misc 3d 998
    (Sup. Ct. N.Y. Co. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

*PowerDsine, Inc. v. AMI Semiconductor, Inc.*, 591 F.Supp.2d 673
    (S.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Ram v. Moritt*, 205 A.D.2d 516 (2d Dept 1994) . . . . . . . . . . . . . . . . . . . . . .  45

*Reeves v. Am. Broad. Companies, Inc.*, 719 F.2d 602 (2d Cir. 1983). . . . . . .  31

*Richmond v. McHale*, 35 A.3d 779 (Pa. Super. Ct. 2012). . . . . . . . . . . . . . .  42

*Rosenthal v. Roberts*, No. 102603/04, 2005 WL 3334272
    (Sup. Ct. N.Y. Co. Oct. 11,  2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

*Rudin v. Dow Jones & Co.*, 510 F. Supp. 210 (S.D.N.Y. 1981). . . . . . . . . . . .  32

*Sexter & Warmflash, P.C. v. Margrabe*, 38 A.D.3d 163
(1st Dept 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

*Sheehan v. Anderson*, No. 98-5516, 2000 WL 288116
(E.D. Pa. Mar. 17, 2000) *aff'd*, 263 F3d 159 (3d Cir 2001). . . . . . . . . 45

*Smith v. Garber*, No. 03-1424, 2003 WL 21960720
(E.D. Pa. June 25, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Stroup v. Nazzaro*, 91 A.D.3d 1367 (4th Dep't 2012).. . . . . . . . . . . . . . 44, 52

*Test Masters Educ. Services, Inc. v. NYP Holdings, Inc.*, No. 06 CV 11407,
2007 WL 4820968 (S.D.N.Y. Sept. 18, 2007). . . . . . . . . . . . . . . . . . 29

*Vodopia v. Ziff-Davis Pub. Co.*, 243 A.D.2d 368 (1st Dep't 1997). . . . . . 40-41

*Weinstein v. Friedman*, No. 94 CIV. 6803, 1996 WL 137313
(S.D.N.Y. Mar. 26, 1996) , *aff'd*, 112 F3d 507 (2d Cir 1996).. . . . . . . . 28

*Wendler v. DePaul*, 499 A.2d 1101 (Pa. Super. Ct. 1985) . . . . . . . . . . . 45-46

## PRELIMINARY STATEMENT

This Appeal arises from the dismissal of all the defamation claims of Plaintiffs-Appellants Oksana S. Baiul ("Baiul") and Oksana, Ltd. ("OLTD"; collectively "Appellants") asserted against Defendants-Appellants Stephen Disson ("Disson") and Disson Skating, LLC (incorporated in Virginia) ("Disson Skating", collectively "Appellees").

Baiul is a professional figure skater and an Olympic gold medalist.

Disson Skating, of which Disson is a principal, is a Virginia limited liability company that produces figure skating shows across the country.

The dispute between the parties arose from Baiul first agreeing to skate in two shows produced by another Disson company, Disson Skating, LLC (incorporated in Pennsylvania) ("Disson PA"), and then backing out of such shows for health reasons. Between the time that Baiul agreed to perform in these shows and her decision to back out, Disson PA allegedly used Baiul's name and likeness in alleged marketing materials.

Baiul then filed an action against Disson Skating and certain NBC entities ("NBC Action") under, *inter alia*, the Lanham Action for alleged improper use of her name and likeness. Shortly thereafter, reporters from the New York Daily News ("Daily News") and the New York Post ("Post") contacted Disson for a response to Baiul's well-publicized lawsuit. All claims against Disson Skating in the NBC Action were dismissed and Baiul has not appealed that ruling.

1

Disson told the reporters from the Post and the Daily News that Baiul's suit lacked merit because Baiul agreed to be in these shows, then backed out, and he never publicly announced that Baiul would be in the shows or used her name or likeness in any promotional or advertising material for these events. As demonstrated below, these statements are true. Even if these statements were false, Baiul – a public figure – submitted no evidence that Disson knew that these statements were false or recklessly disregarded whether they were false.

Furthermore, the alleged defamatory comments attributed to Disson in these two newspapers, which set forth Disson's position as to the NBC Action, are absolutely privileged under New York's absolute litigation privilege and simply cannot serve as a basis for a defamation claim.

Appellants also allege that Disson defamed Baiul through alleged statements, which Disson denies making, that Baiul was "flaky," her lawsuit was "weird," Baiul previously performed "poorly," and that she once did not show up for work. Even if Disson did make these comments, they are protected opinion or rhetorical hyperbole, both of which cannot serve as a basis for a valid defamation claim.

Furthermore, Appellants have zero evidence – except for outlandish speculation based upon a two-page chart with admittedly "random" numbers – that she was in anyway damaged by any of the comments attributed to Disson.

Consequently, the District Court properly dismissed Baiul's defamation claims

2

by holding, *inter alia*, that the alleged defamatory statements were barred by New York's litigation privilege and the single instance rule, not false, and caused no non-speculative damages to Appellants.

## STATEMENT OF THE ISSUES

Did the District Court correctly dismiss Appellants' Amended Complaint based upon the reasons listed below?

1.  Appellants failed to establish a defamation claim under New York law (SPA-35);

2.  Appellants failed to establish that the alleged defamatory statements were false (SPA-36);

3.  Appellants failed to establish that the alleged defamatory statements were made with actual malice (SPA-36);

4.  The alleged defamatory statements were protected by the absolute litigation privilege (SPA-37);

5.  Appellants failed to establish that the alleged defamatory statements caused any non-speculative damages (SPA-37); and

6.  One of the alleged defamatory statements was non-actionable due to the single instance rule (SPA-38).

## STATEMENT OF THE CASE

Appellants filed their original Complaint in the New York Supreme Court, County of New York on February 26, 2013, and thereafter, Defendants removed the Action to the District Court on April 3, 2013. (A-2; Docket No. 1).

By Order dated September 24, 2013 (A-5; Docket No. 25), Appellants were granted leave to file an Amended Complaint. Appellants filed an Amended Complaint on September 27, 2014 (A-6; Docket No. 29), to which Appellees Answered on October 15, 2013. (A-6; Docket No. 30).

On or about October 28, 2013, Appellees filed a motion for summary judgment seeking the dismissal of all claims against them. (A-6-7). On April 24, 2014, the District Court, by Opinion and Order entered on April 24, 2014, granted Appellees' motion for summary judgment and dismissed all of Appellant's claims against them. (SPA-38).

## STATEMENT OF THE FACTS

### The Parties

Baiul, originally from the Ukraine, is a world famous figure skater who won the 1993 World Championship, Ladies Figure Skating, at the age of 15 years old and became the 1994 Olympic Gold Medalist, in Ladies Figure Skating. (A-6;Docket No. 29, at ¶ 2; A-148 at ¶ 1; A-943).

4

Appellant OLTD "is a Pennsylvania corporation owned 100% by Plaintiff and it is the legal entity that has been utilized and continues to be utilized by [Baiul] for some or all of [Baiul's] contracts and business ...." (A-6;Docket No. 29, at ¶ 2; A-149 at ¶ 2; A-943).

Disson is a skating producer and principal of Disson Skating. (A-6;Docket No. 29 at ¶ 4; A-178 at ¶ 1).

**Baiul Hired Steve Martin as Her Agent**

During the relevant time period, Steve Martin ("Martin") was an agent for the Agency Group as has worked as an agent for approximately twenty years. (A-150 at ¶ 8; A-943; A-382-384 [at 8:6 to 10:2], A-462). Martin has been an agent for numerous types of clients, including "legendary performers ... Dolly Parton, David Gilmour, New York Dolls, Squeeze, King Crimson, and Dream Theater." (A-150 at ¶ 8; A-943; A-462).

In May 2011, Baiul met with Martin regarding Martin potentially becoming Baiul's agent. (A-150 at ¶ 9; A-943; A-93-94 [at ¶ 8]; A-472-475[26:55-29:25]). Martin and Baiul discussed that Martin, on behalf of Baiul, would find work for Baiul in skating shows in the United States, such as skating shows produced by Disson and other producers. (A-150 at ¶ 12; A-943; A-388-391 [14:9-17:14]).

Baiul asked Martin to find her work in skating shows because she wanted to go on tour. (A-478-479 [32:5-33:20]). They discussed the possibility of Baiul performing

5

in skating shows produced by Disson's company. (A-502-503 [72:23-73:18]). Baiul never informed Martin that she did not want to perform in a Disson show, and there was no reason for Martin to believe that she did not want to do so. (A-504-505 [74:18 to 75:15]).

According to Martin, there is no doubt that Baiul hired him as her agent as of June 2011. (A-398-399 [24:20 to 25:10]; A-421 [47:12-15]). Martin had authority from Baiul to negotiate skating deals for Baiul and to commit her to such deals. (A-399 [25:3-10]). Baiul never instructed Martin not to use her name in speaking with skating producers and never instructed him not to speak to Disson on her behalf. (A-480 [34:14-21]). Martin had the authority to negotiate skating deals on Baiul's behalf and she never instructed him not to commit her to a show. (A-507 [109:8-24]).

Furthermore, Baiul knew that Martin was speaking to Disson and other producers on her behalf. (A480-482 [34:22-36:15]; A484-485 [38:4-39:7]). Baiul never informed Martin that he should not negotiate with these producers, and she knew that he was negotiating deals for her with them. (A486-488 [40:2 to 42:12]). In fact, in July 2011, Baiul expected that Martin would be receiving offers from skating producers for her to perform in their shows. (A-150 at ¶ 19; A-944; A-494 [60:7-10]).

**Baiul Agreed to Perform in Two of Disson PA's Shows**

On June 22, 2011, Martin emailed Disson and stated that "Btw, I'm working with Oksana Baiul now...she's skating a few TV shows for Jerry Solomon and Fred

6

Boucherle." (A-152 at ¶ 20; A-944; A-740). When Martin wrote "working with Oksana Baiul," he meant that he was representing her as a client. (A398-399 [24:24 to 25:2]).

On July 12, 2011, Martin called Disson to inquire as to whether non-party Disson PA had skating opportunities for his client, Baiul. (A-308 [172:4-11]). During that conversation, Disson offered Martin a deal for Baiul to perform in two of non-party Disson PA's upcoming shows, namely the Improv-Ice show with the band Styx in December 2011 in Greenville, S.C. ("Improv-Ice Show") and the Skating Romance Show ("Romance Show") in the Seattle, WA. area in January 2012 with recording artist Kenny G. (A-741; A-152 at ¶ 23; A-945; A-944-945). It is also undisputed that Disson and Martin discussed non-party Disson PA's offer for Baiul to appear in two Disson PA shows: "As we discussed, I would like to offer Oksana two of my NBC skating entertainment specials ....". (*Id.*)

During that call, Disson explained the details of the offer. (A257 [58:5-15], A267-269 [68:3-70:2]; A-269 [70:11-13]; A-269-270 [70:16-71:13]; A-273-275 [74:25-76:3]; A276-277 [77:9-78:19]; A286 [87:18-21]; A-743).

Later that day, Disson emailed Martin the terms of the offer for Ms. Baiul to perform in the two shows. (A741; A-153 at ¶ 25; A-945). According to Martin, this July 12, 2011 email constituted a clear offer from non-party Disson PA to Baiul. (A-153 at ¶ 26; A-945; A-402 [28:14-22]). Thereafter, Martin and Baiul spoke and Baiul accepted this offer, which Martin conveyed to Disson. (A-402-403 [28:20 to 29:10]; A411-412

7

[37:5-38:20]; A-741 ).  In fact, on July 15, 2011, Martin emailed Disson that Baiul was "ok with the offers ...."  (A-749).

Subsequently, on July 18, 2011, Teresa Guy ("Guy"), Martin's Executive Assistant (A-761 [8:3-16]), emailed Disson, stating: "Hi Steve, I spoke to Oksana, she has confirmed she is good for both the NBC dates." (A-751).  Guy sent Disson this email because she spoke to Baiul, and Baiul again confirmed that she accepted non-party Disson PA's offer. (A-764-766 [19:8-21:25]; A-769-770 [52:11-53:21]; A-773-777 [60:21-64:12]).  Guy was authorized to convey Baiul's acceptance, on Martin's behalf, to Disson, such a communication was within the scope of her employment,  and she often did this for other clients of Martin. (A-427-430 [53:25-56:7]).

Moreover, Baiul confirmed her acceptance of the offers in a July 18, 2011 conversation with Disson himself.  (A-309-310 [173:4-174:3]; A-315-316 [179:22-180:17]).  Thereafter, on July 18, 2011, Disson emailed Martin, stating: "Just spoke at great length with Oksana and we are good to go here." (A-752).

Indeed, Martin testified that there was no doubt that Baiul accepted the offer:

Q.     As of July 18, 2011 was there any doubt in your [Martin's] mind that there was a deal between Oksana Baiul and Disson Skating, LLC for her to perform in those two skating shows?

A.     No, there was no doubt at that time.

(A-431-432 [57:23 to 58:5]).

Based upon the foregoing, Baiul clearly accepted non-party Disson PA's offer for her to appear in Disson PA's two shows. (A-407 [33:5-23]; A-411-412 [37:5-38:20]; A-430 [56:16-23]; [A-443: 89:19-23]; A-445-446 [91:17-92:4]; A-450 [109:3-12]; A-453-459 [112:16-23]; and A-459 [118:13-22]).

Additionally, based upon Baiul's written acceptance of the offer, Disson had authority to use Baiul's name and likeness in advertising, even though he never did so. (A412-413 [38:21-39:13]; A-441 [87:10-16]).

Consequently, Baiul's defamation claim based upon Disson allegedly stating that she agreed to perform in two of his shows is baseless. Baiul did agree to perform in those two shows, and, at the very least, Disson believed she had agreed to such and Baiul did not establish that he knew such a statement was false or recklessly disregarded the truth of such a statement.

## Baiul Backed out of the Two Disson PA Shows

On July 20, 2011, Baiul emailed Martin that she was sick and could not perform in any of the shows. (A-156 at ¶ 38; A-948; A-780; A414-415 [40:6 to 41:16]). Thus, according to Martin, Baiul backed out of the non-party Disson PA shows, to which she agreed. (A-416-417 [42:20-43:10]; A445-446 [91:11 to 92:17]). Martin later emailed Baiul on August 7, 2011, stating: "Dear Oksana, I've notified the 3 producers of the skating events that you will not be appearing for them, due to a health issue. At this

point, I don't feel that myself or The Agency Group can effectively represent you." (A-783).

Thereafter, on August 8, 2011, Martin emailed Disson, stating: "Please be aware that Oksana has informed me that she [is] not going to perform at any of the skating shows she's agreed to, due to health reasons." (A-782). This August 8, 2011 email was the first time that Disson learned that Baiul was not going to be in the Disson PA shows. (A-156 at ¶ 42; A-949-950; A295-296 [146:15 to 147:12]; A-297 [148:2-6]; A-367-368 [256:23-257:2]; A-178 [at ¶ 3]).

Consequently, Baiul's defamation claim based upon Disson allegedly stating that she backed out of his shows is baseless. Baiul did agree to perform in those two shows and then backed out. At the very least, Disson believed she had agreed to perform in those shows and then backed out, and Baiul did not establish that he knew such a statement was false or recklessly disregarded the truth of such a statement.

**Disson PA's Alleged Use of Baiul's Name and Likeness**

As explained above, some of Appellants' defamation claims arise from Appellees' alleged statements that Disson, or one of his companies, did not (a) publically use Baiul's name in marketing or advertising materials; or (b) publically disclose Disson's negotiations with Baiul.

In their Brief (pp. 12-14), Appellants cite to eleven documents that use Baiul's name and likeness: (1) a February 2, 2012 NBC Press Release (A-130); (2) A February 2, 2012 The Entertainment Hotline internet posting, which merely reprinted the NBC

10

Press Release (A-131); (3) a Magic 98.9 radio station internet posting (A-122-124); (4) a Rock 101 radio station internet posting (A-125-127); (5) a "Background Information" packet or "deck" for the Romance Show (A-112-116); (6) a "Background Information" packet or "deck" for the Improv-Ice Show (A-117-121); (7) a "Title Sponsor Proposal" for a potential Stride Rite sponsorship (A-971-985); (8) a "Title Sponsor Proposal" for a potential Stouffer's sponsorship (A-992-1002); (9) a "Background Information" packet or "deck" for the Improv-Ice Show sent to the venue for that show, namely the BI-LO Center (A-1003-1013); (10) a "Fact Sheet" for the Improv-Ice Show allegedly drafted by Lynn Plage ("Plage") (A-1013-1017); and (11) a "Fact Sheet" for the Romance Show allegedly drafted by Plage (A-1018-1022).

As discussed below, none of these documents establish that Appellees publically (a) used Baiul's name in marketing or advertising materials; or (b) disclosed Disson's negotiations with Baiul.

**The February 2, 2012 NBC Press Release**

On February 2, 2012, NBC issued a press release which listed Baiul as a performer for the Romance Show, which was televised two days later, on February 4, 2012. (A-159 at ¶ 60; A-952; A-130). However, Disson never saw this press release before it was posted. (A-159 at ¶ 61; A-952; A-299-305 [150:10-156:5]). According to Jonathan Miller ("Miller"), the President of Programming for NBC Sports Group (A-793-794 [7:21 to 8:2]), the press release was posted on a NBC website and no Disson

11

company had any involvement in the issuance of this press release. (A-159 at ¶ 62; A-952; A-797-798 [106:16-107:25]).

Justine DeMaio ("DeMaio"), a public relations employee for NBC's Public Relations department, oversaw the issuance of this press release. (A-160 at ¶ 63; A-952; A-799 [108:2-21]). It is undisputed that Plage, an independent contractor and publicist for non-party Disson PA, emailed DeMaio on January 31, 2012 – prior to the issuance of the February 2, 2012 press release – a Tune-In Alert for the Romance Show that listed all of the skaters for that show, which did not include Baiul. (A-160 at ¶ 64; A-952; A-299-300 [150:15-151:14]; A-320 [84:6-13]; A808).

DeMaio received this email and Tune-In Alert prior to the issuance of the NBC press release. (A-160 at ¶ 65; A-952; A-799-802 [108:22 to 112:14]; A808). Gillian Lusins ("Lusins"), in-house counsel for NBC, sent Baiul's prior counsel a letter on May 25, 2012 stating that NBC's issuance of this press release with Baiul's name was an "unfortunate error" and that it "mistakenly referred to a outdated list of participants ...." (A-160 at ¶ 66; A-952; A-132-133).

Baiul admits that her only "evidence" that a Disson company caused the press release is Lusins's May 25, 2012 letter. (A-160 at ¶ 67; A-952; A-518-519 [149:10-150:23]). However, Lusins's letter admits that the NBC press release was an error of NBC – not of any Disson entity – because NBC did not rely upon the current list of

skaters for the Romance Show when issuing that release. (A-160 at ¶ 68; A-952; A-132-133).

Therefore, based upon the foregoing, it is clear that no Disson company caused or was involved in the issuance of the NBC press release. Furthermore, this document does not evidence that Disson, or one of his companies, publically (a) used Baiul's name in marketing or advertising materials; or (b) disclosed Disson's negotiations with Baiul.

**The Entertainment Hotline Posting**

On February 2, 2012, a website, theentertainmenthotline.net, re-posted the NBC press release on its website. (A-160 at ¶ 70; A-953; A-131). A comparison of the NBC press release (A-130) and The Entertainment Hotline posting (A-131) makes clear that the exact same text is in both, and thus, The Entertainment Hotline posting merely reprinted the NBC press release.

No Disson company had any involvement with this posting and Disson only learned of it after Baiul commenced litigation in 2013. (A-161 at ¶ 73; A-953; A-171 [at ¶9]).

Baiul admits that she has no evidence that a Disson company was involved in The Entertainment Hotline posting and she only "assumed" one was involved. (A-161 at ¶ 75; A-953; A-520-521 [151:10-152:6]).

Therefore, this internet posting does not evidence that Disson, or one of his companies, publically (a) used Baiul's name in marketing or advertising materials; or (b) disclosed Disson's negotiations with Baiul.

**The Radio Internet Postings**

As to the Fall of 2011 Magic 98.9 and ROCK 101 radio station internet postings for the Improv-Ice Show (A-122-127), neither Disson Skating nor non-party Disson PA had anything to do with these advertisements and any information that these stations used to post these advertisements did not come from Disson Skating or non-party Disson PA. (A-159 at ¶ 57; A-952; A297–299 [148:7-150:9]; A328-329 [204:24-205:9]).

Disson did not even know about these advertisements until Baiul filed her lawsuit in February 2013. (A-159 at ¶ 57; A-952 A370-371 [259:7 to 260:6]).

Baiul admits that her sole "evidence" that a Disson company was involved with these advertisements is that a Disson company purportedly paid for these advertisements and that a Disson company was the producer of the show. (A515-518 [146:21-149:9]).

However, the venue that hosted the show, not a Disson company, paid for the advertising for this show. (A366-369 [255:6-19]; A-369 [258:13-20]; A-371 [260:2-6]; A179 [at ¶5]). Moreover, all of the advertisements that were issued by the venue were approved by non-party Disson PA, and none of them named Baiul. (A-159 at ¶ 58; A-952; A-297-299 [148:7-150:9]; A328-329 [204:24-205:9]; A370-371 [259:7-260:6]; A-853).

Lastly, Rik Knopp ("Knopp"), the Director of Sales and Marketing for the BI-LO Center, stated that he communicated with the radio stations' Digital Creative Director, who stated that she did not remember how Baiul's name was included in those radio advertisements and that she thought the information came from the Styx website, *i.e.* not a Disson company. (A-786).

Therefore, these radio station advertisements do not evidence that Disson, or one of his companies, publically (a) used Baiul's name in marketing or advertising materials; or (b) disclosed Disson's negotiations with Baiul.

**"Background Information" Decks**

On July 12, 2011, Disson, on behalf of non-party Disson PA, emailed Martin a written offer for Baiul to perform in the Improv-Ice and Romance Shows. (A-741-742; A-157 at ¶ 47; A-951). Attached to that email were two attachments, namely the above-referenced "Background Information" Decks. (A-742; A-157 at ¶ 47; A-951). Thereafter, on July 13, 2011, Martin forwarded the July 12, 2011 email to Baiul with the two attachments. (A-741-742; A-157 at ¶ 48; A-951).

The basis for the alleged use of Baiul's name and likeness in "decks" were the two attachments to this email chain. (A-741-742; A-495-499 [61:9-65:15]). Martin testified that he does not remember even opening the attachments to that email. (A-404-405 [30:22 to 31:4]; A-158 at ¶ 50; A-951).

Thus, Baiul's sole alleged "evidence" of Disson Skating purportedly using her name and likeness in these "decks" is that Disson, on behalf of non-party Disson PA, emailed them to Martin, her agent and at the very least her "potential agent." (A-93 [at ¶ 8]; A-495-499 [61:9-65:15]).

However, Baiul admits that she has no evidence that this document was sent to anyone besides her and Martin. (A-510-512 [141:4-9; 143:4-14]).

Therefore, these two "decks" do not evidence that Disson, or one of his companies, publically (a) used Baiul's name in marketing or advertising materials; or (b) disclosed Disson's negotiations with Baiul.

**Stride Rite Proposal**

On July 21, 2011, after Baiul had committed to the Improv-Ice Show and before she backed out, non-party Disson PA emailed Tamara Rabi ("Rabi") at Optimedia a proposal for the company Stride Rite to be a title sponsor of the Improv-Ice Show ("Stride Rite Proposal"; A-971-985). The Stride Rite Proposal used Baiul's name and likeness. (*Id.* at DISSON 893-894).

However, on July 25, 2011, before Baiul backed out of the Improv-Ice Show, Rabi emailed Disson that Stride Rite was not interested in becoming a title sponsor. (A-829).

Therefore, this proposal does not evidence that Disson, or one of his companies, publically (a) used Baiul's name in marketing or advertising materials; or (b) disclosed

16

Disson's negotiations with Baiul.

**Stouffer's Proposal**

On July 21, 2011, after Baiul had committed to the Improv-Ice Show and before she backed out, Disson emailed Jackie Dyson ("Dyson") at Zenith Media a proposal for the company Stouffer's to be a title sponsor of the Improv-Ice Show ("Stouffer's Proposal"). (A-161 at ¶ 76; A-953 A-987-1002). The Stouffer's Proposal used Baiul's name and likeness. (*Id.*).

However, on August 2, 2011, before Baiul backed out of the Improv-Ice Show, Dyson emailed Disson that Stouffer's was not interested in becoming a title sponsor. (A-162 at ¶ 78; A-953; A-815).

Therefore, this proposal does not evidence that Disson, or one of his companies, publically (a) used Baiul's name in marketing or advertising materials; or (b) disclosed Disson's negotiations with Baiul.

**Background Information Sent to the BI-LO Center**

On July 14, 2011, non-party Disson PA sent the BI-LO Center, the venue for the Improv-Ice Show, a Background Information packet – a "deck" – for that show, which listed Baiul as a "Suggested Skater." (A-163 at ¶ 86; A-954; A-1004-1012). According to Knopp, the Director of Sales and Marketing for the BI-LO Center, that "deck" was not sent to anyone while the list of sponsors was finalized. (A-1004).

Knopp stated that the BI-LO Center "never used Oksana Baiul in any advertising

17

audio or video as well as any type of release." (A-853).  Furthermore, the "deck" that the BI-LO Center used did not use Baiul's name or likeness. (A-860-864).

Therefore, this "deck" does not evidence that Disson, or one of his companies, publically (a) used Baiul's name in marketing or advertising materials; or (b) disclosed Disson's negotiations with Baiul.

**The Fact Sheets**

While Appellants cite to two "fact sheets" that list Baiul (A-1013-1022), they fail to cite any evidence that these documents were sent to anyone or that they were sent by any Disson entity. (A-1224 [¶ 39]).  Apparently, because these documents list Plage as the "owner" of the document, Plage purportedly drafted them; and because these documents were produced by NBC during discovery, Plage purportedly emailed them to NBC.  However, Appellants cite to no evidence that Disson or his companies had any idea that these fact sheets were drafted or that they were sent to NBC. Indeed,  Plage was an independent contractor for Disson PA, not an employee, and she did not "copy" Disson on her emails that she sent to NBC. (A-320).

Therefore, these "fact sheets" do not evidence that Disson, or one of his companies, publically (a) used Baiul's name in marketing or advertising materials; or (b) disclosed Disson's negotiations with Baiul.

**Print and Radio Advertisements for These Two Shows**

All advertisements for the two shows at issue were handled by the venues for those shows, and none of those advertisement included Baiul's name. (A-161 at ¶ 74; A-953; A-297-299 [148:7-150:9]; A-328-329 [204:24-205:9]; A370-371 [259:7 to 260:6]).

Appellees submitted copies of all of the print and internet advertising for the Improv-Ice Show that are attached to the Disson Decl. as Exhibit 1, none of which mention Baiul. (A-165 at ¶ 107; A-954; A-181-189; A179 [¶ 7]). Furthermore, Appellants submitted copies of all of the print and internet advertising for the Romance Show, none of which mention Baiul. (A-165 at ¶ 108; A-954; A-190-208; A179 [¶ 7]).

Appellees also submitted all of the radio advertisements for these two shows on a CD-Rom, and none of them mention Baiul. (A-165 at ¶ 109; A-954; A-209; A179 [¶ 8]).

**The Alleged Defamatory Statements**

Baiul is a public figure. (A-6, Docket No. 29 at ¶ 2). Baiul considers herself the "queen of the ice," a "superstar," and a "global entertainer." (A-624 [382: 7-8]; A-643 [424: 11-21]).

Appellants' defamation claims arise from alleged statements of Disson published in the New York Daily News ("Daily News") on February 4, 2013 ("Daily News Article") and the New York Post ("Post") on February 5, 2013 ("Post Article"). (A-6,

19

Docket No. 29 at ¶¶ 10, 29 and *passim*; *see also* A-6, Docket No. 29 at Exhibits 6 and 12).

The Daily News and Post Articles were about Baiul suing NBC and Disson Skating in the NBC Action for allegedly using Baiul's name and likeness in promotional and advertising materials without her permission. (A-6, Docket No. 29 at Exhibits 6 and 12 to Exhibit A).

The alleged statements of Disson published in these two articles were published to set forth Disson and Disson Skating's response to, and position as to, the NBC Action. *Id.* Baiul's understanding of the meaning of a "malicious" statement is a false statement of a person who knows that the statement is false. (A-646-647 [427:20 to 428:20]).

**<u>First and Ninth Causes of Action</u>**

Appellants' First and Ninth Causes of Action are based upon Disson's alleged statement to the Daily News that: "his company never publically disclosed his negotiations to have Baiul [Plaintiff] appear." (A-6, Docket No. 29 at ¶¶ 47 and 135).

Neither Disson nor a Disson company ever publicly disclosed his "negotiations" with Baiul. (A-344-355 [233:16 to 239:13]). According to Disson, "negotiations" between non-party Disson PA and Baiul constituted his July 2011 communications with Martin. (A-348-349 [237:21 to 238:4]).

Baiul admits that she has no evidence that if Disson made this statement that he

knew it was false. (A-612-613 [370:21 to 371:14]). She merely claims that Disson purportedly knew that this statement was false because he sent proposals with her name on it to proposed sponsors. *Id.* Baiul claims that her sole evidence that this statement was maliciously made is that Disson sent such proposals. (A-565-566 [292:3 to 293:8]).

Furthermore, Appellants fail to articulate how sending such proposals to potential sponsors is a public disclosure of Disson's negotiations with Martin.

## Second and Tenth Causes of Action

Appellants' Second and Tenth Causes of Action are based upon Disson's alleged statement to the Daily News that: "[i]t's just weird." (A-6, Docket No. 29 at ¶¶ 58 and 146). Disson denies that he made this statement. (A-350-351 [239:22 to 240:21]). Even assuming that Disson did make this statement, Baiul admits that she has no evidence that if Disson made this statement that he knew it was false. (A-612 [370:5-14]). Baiul claims that her sole evidence that this statement was maliciously made is that she and her lawsuit are allegedly not weird. (A-573-574 [315:4 to 316:4]).

Furthermore, Appellants did not submit any evidence that Disson knew that Baiul and her claims in the NBC Action were not weird or that he recklessly disregarded the truth of such a purported statement.

## Third and Eleventh Causes of Action

Appellants' Third and Eleventh Causes of Action are based upon Disson's alleged statement to the Daily News that: "Baiul [Plaintiff] had called him to say how much she

appreciated his offer, given how poorly she had performed on prior shows." (A-6, Docket No. ¶¶ 60 and 157]). Disson denies that he made the statement "given how poorly she had performed on prior shows." (A-351-353 [240:22 to 242:2]).

Baiul claims that her sole evidence that this statement was maliciously made is that the statement is allegedly false. (A-577 [329:11-23]).

Furthermore, Appellants did not submit any evidence that Disson knew that Baiul did not perform poorly in prior performances or that he recklessly disregarded the truth of such a purported statement.

**Fourth and Twelfth Causes of Action**

Appellants' Fourth and Twelfth Causes of Action are based upon Disson's alleged statement to the Daily News that: "[e]ach time she had been a little flaky." (A-6, Docket No. 29, ¶¶ 80 and 168). Disson denies that he made this statement. (A-353-354 [242:25 to 243:21]). Even assuming that Disson did make this statement, Baiul admits that she has no evidence that if Disson made this statement that he knew it was false. (A-611-612 [369:5-370:4]).

Baiul claims that her sole evidence that this statement was maliciously made is that she is allegedly not flaky. (A-586-587 [338:11 to 339:2]). Baiul admits that she does not even know what the statement "she has been a little flaky" means or how one would determine whether or not a person is flaky. (A-578-582 [330:22 to 334:6]).

22

Furthermore, Appellants did not submit any evidence that Disson knew that Baiul was not flaky or that he recklessly disregarded the truth of such a purported statement.

**Fifth and Thirteenth Causes of Action**

Appellants' Fifth and Thirteenth Causes of Action are based upon Disson's alleged statement to the Daily News that: "One time, she didn't show up. She was out shopping ...." (A-6, Docket No. 29 at ¶¶ 91 and 179). Disson denies that he made this statement. (A-355 [244:7-20]).

Even assuming that Disson did make this statement, Baiul admits that she has no evidence that if Disson made this statement that he knew it was false. (A-610-611 [368:10 to 369:4]). Baiul claims that her sole evidence that this statement was maliciously made is that the statement is allegedly not true. (A-595 [353:5-13]).

According to Disson, as to this issue, he told the Daily News reporter the following:

> I said to the reporter, at one time, we had a show where she was schedule to be there for a dress rehearsal and she did not show for the up dress rehearsal. I didn't say that she did not show up, I said that did not show up on time for a dress rehearsal and I later found out from Brian Boitano, that when he located her, she was out shopping.

(A-355-356 [244:23 to 245:6]).

Disson's basis for making this statement was that during the time of a dress rehearsal of a prior show where he was present, the famous male figure skater Brian Boitano ("Boitano") informed Disson that Baiul was late for a dress rehearsal, Boitano

23

could not find her, and Boitano later found out that she was missing because she was

shopping – all of which Boitano communicated to Disson:

> I don't know if it was text or -- he [Boitano] communicated to Oksana
> because we had a dress rehearsal that day for our show that we do the day
> of the show and we could not find her. Brian, apparently tracked her down
> and told us where she was at the time and then she eventually came to the
> rehearsal. *** The past difficulties in 1995 was in our show that we did in
> Brian's skating romance where we had a dress rehearsal that was on
> everyone's schedule on the day of the show and ... we had to delay
> significantly the start of that dress rehearsal because she was not there on
> time and we could not find her. *** It is the one where Brian Boitano
> finally located her and said to us -- this was us being Lee Ann Miller and
> myself, that he had located her and she was in Beverly Hills and she was
> shopping and she would be there as soon as she could.*** A dress
> rehearsal with our entire cast and our television production. This is when
> they block the show and do any everything else. It was significantly
> delayed because she was not there and we could not start the dress
> rehearsal without her.

(A-327 [203:5-11]; A-340 [224:7-13,16-21; and A-340-341 [224:24 to 225:5]).

Baiul admits that her former agent, David Baden of IMG, heard the same facts as

described by Disson. (A-588 [340:5-20]). Baiul also admits that prior to 2011, it was

gossip in the skating business that Baiul missed an event because she was out shopping.

(A-589-591 [341:10 to 343:4]). Furthermore, Baiul cannot remember if she ever missed

a dress rehearsal. (A-591 [343:10-15]).

Furthermore, Appellants did not submit any evidence that Disson knew that Baiul

did not fail to show up for work because she was shopping or that he recklessly

disregarded the truth of such a purported statement.

24

**Sixth and Fourteenth Causes of Action**

Appellants' Sixth and Fourteenth Causes of Action are based upon Disson's alleged statement to the Daily News that: "[s]he was grateful for a third chance ...." (A-6, Docket No. 29 at ¶¶ 102 and 190). Disson denies that he made this statement. (A-356-367 [245:16 to 246:7]).

Even assuming that Disson did make this statement, Baiul admits that she has no evidence that if Disson made this statement that he knew it was false. (A-609-610 [367:23 to 368:9]). Baiul also admits that she does not even know what this statement means. (A-597-598 [355:17 to 356:8]). Baiul claims that her sole evidence that this statement was maliciously made is that the alleged statement is allegedly false. (A-600-601 [358:21 to 359:2]).

Furthermore, Appellants did not submit any evidence that Disson knew that Baiul was not grateful for a third chance or that he recklessly disregarded the truth of such a purported statement.

**Seventh and Fifteenth Causes of Action**

Appellants' Seventh and Fifteenth Causes of Action are based upon Disson's alleged statement to the Post that: "she [Plaintiff] approached him through an agent in mid-2011 and asked to be included in the shows then backed out within weeks after he agreed – well before he started ads for them." (A-6, Docket No. 29 at ¶¶ 113 and 201). Disson denies that he made this statement. (A-358 [247:7-18]).

25

Disson made the following statement to the Post:

What I said was, that I was approached in mid-2011 by Oksana Baiul's agent who approached me about including her in our shows and after he and she agreed to do our shows decided later to pull out of our shows. *** After he and she confirmed that she had agree[d] to do our shows, she decided to not do our shows, however, this is before we []ever announced her publicly.

(A-358-359 [247:19 to 248:4]). This statement and the statement attributed to Disson by Appellants are true because (a) Baiul confirmed that she would be in the two non-party Disson PA shows personally and through her agent, Martin (A-359-361[248:19 to 250:16]); (b) no Disson company ever announced publicly that she would be in these two Disson shows (A-293-294 [144:20 to 145:24]; A-296-296 [147:17 to 148]:6; A-347 [236:14-24]; A-349-350 [238:14 to 239:3]; A-362 [251:7 to 252:12]; A-366 [255:6-19]; and (c) Baiul did agree to perform in these two Disson shows, and then she backed out of them, *see* discussion *supra*.

Even assuming that Disson did make the statement as described by Baiul in her Amended Complaint, Baiul admits that she has no evidence that Disson knew it was false. (A-607-609 [365:24 to 367:3]). Baiul also claims that her sole evidence that this statement was maliciously made is that the alleged statement is allegedly false. (A-613-614 [371:23 to 372:21]).

Therefore, Appellants did not submit any evidence that Disson knew that the above quoted statement (either the version of Appellants or Disson) was false or that

26

Disson recklessly disregarded the truth of such a statement.

**Eighth and Sixteenth Causes of Action**

Appellants' Eighth and Sixteenth Causes of Action are based upon Disson's alleged statement to the Post that: "[w]e never announced Oksana [Plaintiff] in either show or featured her in any of our advertising or promotional materials." (A-6, Docket No. 29 at ¶¶ 124 and 212. Disson made this statement. (A-361-362 [250:17 to 251:3]).

This statement is true because, as demonstrated above, no Disson company ever announced that Baiul was in these two shows or named Baiul in any advertising or promotional materials for these shows. (A-362-363 [251:5 to 252:12]; A-366 [255:6-19]; *see also* A-293-294 [144:20 to 145:24]; A-296-297 [147:17 to 148:6]; A-347 [236:14-24]; A-349-350 [238:14 to 239:3]. Baiul admits that she has no evidence that when Disson made this statement that he knew it was false. (A-619 [377:3-8]). Baiul claims that her sole evidence that this statement was maliciously made is that the alleged statement is allegedly false. (A-621-622 [379:14 to 380:11]).

# ARGUMENT

## POINT I

## NEW YORK LAW APPLIES TO APPELLANTS' DEFAMATION CLAIMS

The law of the state wherein the tort – here defamation – occurred applies:

> A federal court sitting in diversity applies the choice of law rules of the forum state. In tort cases like this, New York applies the law of the state with the most significant interest in the litigation. In weighing interests, New York distinguishes between "conduct regulating" and "loss allocating" rules. *** Discouraging defamation is a conduct regulating rule, and, so ... the situs of the tort, should control.

*Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir 1999) (citations omitted).[1]

Furthermore, "in a multistate libel case, where the plaintiffs were from different jurisdictions and the alleged harm to their reputations would be diffused throughout the country and overseas, the state where defendants' significant acts and omissions gave rise to their liability is the most appropriate source of legal norms, particularly when it is also the forum state." *Weinstein v. Friedman*, No. 94 CIV. 6803, 1996 WL 137313, * 8 (S.D.N.Y. Mar. 26, 1996) (Preska, J.) (Citations and quotations omitted), *affd*, 112 F3d 507 (2d Cir 1996).

Moreover, when the alleged defamatory statements are ones that describe a

---

[1] *See also AroChem Intern., Inc. v. Buirkle*, 968 F.2d 266, 271 (2d Cir. 1992) ("A judicial-proceeding privilege is conduct-regulating. '[T]he purpose of a common law or statutory privilege is the regulation of defamatory conduct that occurs within a state's borders.' *** The judicial-proceeding privilege would lose its force if weight were given to the domicile of the parties or the place of injury in determining choice of law.").

pending litigation, the law of the state where that litigation is pending should apply.[2] The same holds true when the alleged defamatory statements are published by New York newspapers like the New York Post and Daily News.[3]

Additionally, when the Court is faced with questions of privilege and opinion as to the alleged defamatory statements, the law of the state of the site of the publication should control. *See PowerDsine, Inc. v. AMI Semiconductor, Inc.*, 591 F.Supp.2d 673, 680 (S.D.N.Y. 2008) (Scheindlin, J) ("[W]hen faced with questions concerning privilege and opinion, New York choice of law rules place particular weight on the location of publication.").

Lastly, the law of the state where Plaintiff's reputation is the most important should also control. *See Grass v. News Group Publications, Inc.*, 570 F.Supp. 178, 186 *(S.D.N.Y. 1983) (Sand, J.) ("[A]lthough Rite Aid has its principal headquarters in Pennsylvania, its reputation in New York is in many respects of greater concern to it than is the case with Pennsylvania.").

Here, the Court is faced with questions of absolute privilege and opinion,

---

[2]  *See Keough v Texaco Inc.*, 97 CIV. 5981 LMM, 1999 WL 61836, * 5 (S.D.N.Y. Feb. 10, 1999) (McKenna, J.)(The alleged defamatory statements "concerned conversations and activity occurring in New York in connection with the Roberts litigation, a lawsuit filed in New York.").

[3]  *See Test Masters Educ. Services, Inc. v. NYP Holdings, Inc.*, No. 06 CV 11407, 2007 WL 4820968, * 5 (S.D.N.Y. Sept. 18, 2007) (Jones, J.) ("[T]he allegedly defamatory article emanated from New York via its publication in the Post.").

Disson's alleged defamatory statements concern a litigation pending in New York, namely the NBC Action[4], and such statements were made to and published by the New York Daily News and the New York Post– both New York newspapers. The alleged defamatory statement also arise from Disson's negotiations with Baiul's agent, Martin, who was based in New York – the location of Martin's meeting with Baiul. (A-377, 382-383, 462, 472-473).

Further, Baiul's reputation is more important in New York than in Pennsylvania because in 2011, Baiul performed three times in New York but never in Pennsylvania; in 2010, she performed eleven times in New York but never in Pennsylvania; in 2009, she performed in New York nine times but never in Pennsylvania; in 2008, she performed four times in New York but never in Pennsylvania; and in 2007, she performed fifty-two times in New York but never in Pennsylvania. (A-667-670, 933-941).

Baiul is claiming that her loss of reputation has caused her to lose opportunities to perform as a skater, but has submitted no evidence that she has ever performed in Pennsylvania. However, the record clearly establishes that she has continuously performed in New York every year since 2007.

The cases cited by Appellant do not hold otherwise. In *Lee*, the Court specifically ruled that its holding would not apply to "cases of *multi-state* publication of defamatory

---

[4] *Baiul v. NBC Universal Media, LLC*, No. 13-cv-02205-KBF (S.D.N.Y.).

30

material—i.e., publication of a libelous article by a magazine that is distributed in a large number of states," which is the case in this Action. *Lee*, 166 F.3d at 545 (emphasis in original).

In *Condit v. Dunne*, 317 F. Supp. 2d 344, 353 (S.D.N.Y. 2004), the Court held that if "the publication is made nationwide, the tort essentially lacks a locus, but rather injures plaintiff everywhere at once ... [and] determining which state has the most significant relationship to the litigation requires a more comprehensive analysis." The Court applied California law, not that of New York, because "but none of the conduct about which defendant spoke took place in New York, and plaintiff has no specific connection to New York." *Id.* at 355. Here, Disson was speaking about a lawsuit filed in New York, and Baiul had significant connections to New York because she filed the lawsuit here, her manager (whose negotiations with Disson are key to this Action) was located here, she had her meeting with Martin here, and she has continuously performed in New York every year since 2007 and never in Pennsylvania.

In *Reeves v. Am. Broad. Companies, Inc.*, 719 F.2d 602, 605 (2d Cir. 1983), the Court held that the law of the state where the "most damage to [plaintiff's] reputation" would occur should apply. Here, Baiul alleges that her damages arise from her alleged loss of professional skating opportunities and, according to the record, she has never performed in Pennsylvania and has performed numerous times in New York every year since 2007.

31

In *La Luna Enterprises, Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 389 (S.D.N.Y. 1999), the Court held "Florida has a more significant interest because plaintiff's principal place of business is in Florida; plaintiff is incorporated in Florida; plaintiff alleges it suffered injury to its reputation in Florida; and lastly CBS filmed footage of plaintiff's establishment, and broadcast its report, in Florida." Here, Appellants have no evidence that Baiul's professional reputation was injured in Pennsylvania because she never performed in that state, and the Daily News and Post are based in New York, and there is no evidence that their reporters ever traveled to Pennsylvania for the articles at issue.

In *Rudin v. Dow Jones & Co.*, 510 F. Supp. 210, 216 (S.D.N.Y. 1981), the Court never decided the choice of law issue and held "the plaintiff's domicile 'should not be transformed into a rigid rule' for determining choice of law issues in libel actions."

In *Machleder v. Diaz*, 801 F.2d 46, 52 (2d Cir. 1986), the Court applied New Jersey law because the defamation claim arose from a story about conduct in New Jersey, the story focused on an interview in New Jersey and the story was prepared by a New Jersey reporter. Here, the media articles were about a lawsuit filed in New York and negotiations conducted in New York by Martin, and such articles were drafted by New York reporters.

In *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 360 (S.D.N.Y. 1998), the Court applied the following nine factor test, which favor the application of New York

law in this Action:

> (1) the state of the plaintiff's domicile; (2) the state of plaintiff's principal activity to which the alleged defamation relates; (3) the state where the plaintiff in fact suffered greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where the defendant's main publishing office is located; (6) the state of principal circulation; (7) the place of emanation; (8) the state where the libel was first seen; and (9) the law of the forum.

Here, the conduct about which the defamation relates is Baiul's lawsuit filed in New York, she suffered more harm (if any) in New York than in Pennsylvania, the alleged defamatory statements were published from New York based media companies, and she chose to file her defamation lawsuit in New York.

In *Levin v. McPhee*, 917 F. Supp. 230, 236 (S.D.N.Y. 1996), *aff'd*, 119 F.3d 189 (2d Cir. 1997), the Court applied New York law because "the conduct at issue – publication of the allegedly libelous statements – took place in New York, where the author resides and where both publishers are headquartered." Similarly, the Court in *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1092 (S.D.N.Y. 1984) held that New York law applied because the publication of the defamatory material centered in New York. Here, the alleged defamatory statements were published by New York newspapers.

Accordingly, New York law should apply to Appellants' defamation claims. Regardless, as demonstrated below, such claims also fail under Pennsylvania law.

## POINT II

## MOST OF APPELLANTS' DEFAMATION CLAIMS
## ARE BARRED BY THE ABSOLUTE LITIGATION PRIVILEGE

**New York Law**

"Section 74 of the Civil Rights Law prohibits a civil action that alleges injury from the publication of a fair and true report of any judicial proceeding. The absolute privilege under that statute also extends to the release of background material with regard to the case, so long as the statement is a substantially accurate description of the allegation." *Fishof v. Abady*, 280 A.D.2d 417, 417 (1st Dep't 2001) (internal citations and quotations omitted).

As held by Judge Swain:

Under New York law, "in the context of a legal proceeding, statements by parties and their attorneys are absolutely privileged if, by any view, or under any circumstances, they are pertinent to the litigation." *O'Brien v. Alexander*, 898 F.Supp. 162, 171 (S.D.N.Y.1995). The concept of pertinent material is "extremely broad" and "embraces anything that may possibly or plausibly be relevant or pertinent, with the barest rationality, divorced from any palpable or pragmatic degree of probability." *Id.* All that is required for a statement to be privileged is a minimal possibility of pertinence. *See Seltzer v. Fields*, 20 A.D.2d 60, 244 N.Y.S.2d 792, 795–96 (1st Dep't 1963), *aff'd*, 14 N.Y.2d 624, 249 N.Y.S.2d 174, 198 N.E.2d 368 (1964). The rule rests upon the notion that parties "should be able to 'speak with the free and open mind which the administration of justice demands' without the constant fear of libel suits." *Mosesson v. Jacob D. Fuchsberg Law Firm*, 257 A.D.2d 381, 683 N.Y.S.2d 88, 89 (1st Dep't 1999) (citation omitted).

*Lipin v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa.*, 202 F.Supp.2d 126, 137-38

(S.D.N.Y. 2002).

Additionally, if the statement is "a substantially accurate description of [a party's] position in ... [a] proceeding [it is] privileged under New York Civil Rights Law § 74." *Mulder v. Donaldson, Lufkin & Jenrette*, 208 A.D.2d 301, 310 (1st Dep't 1995); *see also Hudson v. Goldman Sachs & Co*, No. 600502/00, 2000 WL 35928688 (Sup. Ct. N.Y. Co. Dec. 18, 2000) ("The statement to the New York Times was a substantially accurate description of defendant's position in the action commenced by plaintiff and thus was privileged under New York Civil Rights Law Section 74.").

Here, in this Action, Appellants' defamation claims arise from alleged statements of Disson published in the Daily News on February 4, 2013 ("Daily News Article") and the Post on February 5, 2013 ("Post Article"). (A-6, Docket No. 29 at ¶¶ 10, 29 and Exs. 6 and 12). The Daily News Article and Post Article were about Baiul suing NBC and Disson Skating in the NBC Action for allegedly using Baiul's name and likeness in promotional and advertising materials without her permission. (*Id.*). The alleged statements of Disson in these two articles were published to set forth Disson's response to and position as to this lawsuit. (*Id.*).

Specifically, Appellants' First and Ninth Causes of Action are based upon Disson's alleged statement to the Daily News that: "his company never publically disclosed his negotiations to have Baiul [Plaintiff] appear." (A-6, Docket No. 29 at ¶¶ 47 and 135). This statement is consistent with Disson Skating's position in the NBC

Action, which Disson made clear in his deposition. Disson testified that (a) neither Disson nor Disson PA ever publicly disclosed his "negotiations" with Baiul (A-344-350 [233:16 to 239:13]); and (b) "negotiations" between Disson PA and Baiul constituted his July 2011 communications with Martin. (A-348-349 [237:21 to 238:4]).

Appellants' Second and Tenth Causes of Action are based upon Disson's alleged statement to the Daily News that: "[i]t's just weird." (A-6, Docket No. 29 at ¶¶ 58 and 146). While Disson denies that he made this statement (A-350-351 [239:22 to 240:21]), labeling a lawsuit as "weird" can be interpreted as conveying that the lawsuit has no factual basis. Thus, this statement is consistent with Disson Skating's position – as he described in his deposition – that (a) Disson and Disson PA never publicly used Baiul's name and likeness (*see* discussion *supra*); (b) Baiul agreed to do the Disson shows (A-257 [58:5-15]; A-267-269 [68:3 to 70:2]; A-269 [70:11-13]; A-269-270 [70:16 to 71:13]; A-273-275 [74:25 to 76:3]; A-276-277 [77:9 to 78:19]; and A-286 [87:18-21]; A-308 [172:4-11]; A-309 [173:4 to 174:3]; A-315-316 [179:22 to 180:17]); and (c) Baiul then backed out of these events (A-295-296 [146:15 to 147:12]; A-297 [148:2-6]; A-367-368 [256:23 to 257:2]).

Appellants' Third and Eleventh Causes of Action are based upon Disson's alleged statement to the Daily News that: "Baiul [Plaintiff] had called him to say how much she appreciated his offer, given how poorly she had performed on prior shows." (A-6, Docket No. 29 at ¶¶ 60 and 157). While Disson denies that he made the second

36

part of this statement that she previously performed poorly (A-351-353 [240:22 to 242:2]), this statement can be read to convey that Baiul appreciated Disson's offer to perform in the Disson shows.  As described by Disson in his deposition, that statement is consistent with Disson Skating's position in the NBC Action because Baiul's appreciation is further evidence that she agreed to perform in the  Disson shows.  (A-352-353 [241:16-17; 242:13-17]).

Appellants' Sixth and Fourteenth Causes of Action are based upon Disson's alleged statement to the New York Daily News that: "[s]he was grateful for a third chance ...." (A-6, Docket No. 29 at ¶¶ 102 and 190). While Disson denies that he made this statement (A-356-357 [245:16 to 246:7]), this statement can also be read to convey that Baiul appreciated Disson's offer to perform in the Disson shows.  As noted above, such a statement is consistent with Disson Skating's position in the NBC Action because Baiul's appreciation supports the argument that she agreed to perform in the Disson shows.

Appellants' Seventh and Fifteenth Causes of Action are based upon Disson's alleged statement to the New York Post that: "she [Plaintiff] approached him through an agent in mid-2011 and asked to be included in the shows then backed out within weeks after he agreed – well before he started ads for them." (A-6, Docket No. 29 at ¶¶ 113 and 201). While Disson denies that he made this statement (A-358 [247:7-18]), this statement is consistent with Disson Skating's position in the NBC Action that (a) Disson

37

and *non-party* Disson PA never publicly used Baiul's name and likeness (*see* discussion *supra*); (b) Baiul agreed, through her agent – Martin, to perform in the Disson Shows (A-257 [58:5-15]; A-267-269 [68:3 to 70:2, 70:11-13]; A-269-270 [70:16 to 71:13]; A-273-275 [74:25 to 76:3]; A-276-277 [77:9 to 78:19]; A-286 [87:18-21]; A-308 [172:4-11]; A-309-310 [173:4 to 174:3]; A-315-316 [179:22 to 180:17]); and (c) Baiul then backed out of these shows (A-295-296 [146:15 to 147:12]; A-297 [148:2-6]; A-367-368 [256:23 to 257:2]).

Appellants' Eighth and Sixteenth Causes of Action are based upon Disson's alleged statement to the New York Post that: "[w]e never announced Oksana [Plaintiff] in either show or featured her in any of our advertising or promotional materials." (A-6, Docket No. 29 at ¶¶ 124 and 212). This statement is consistent with Disson Skating's position in the NBC Action that Disson PA never announced that Baiul was in the Disson Shows or named Baiul in any advertising or promotional materials for these shows. (A-362-363 [251:5 to 252:12]; A-366 [255:6-19]; A-293 [144:20 to 145:24]; A-296-297 [147:17 to 148:6]; A-346 [236:14-24]; A-349-350 [238:14 to 239:3]).

Accordingly, all of the above alleged defamatory statements are a substantially accurate description of Disson Skating's position in the NBC Action and are thus absolutely privileged. Hence, the Court should affirm the dismissal of Appellants' (a) First and Ninth Causes of Action; (b) Second and Tenth Causes of Action; (c) Third and Eleventh Causes of Action; (d) Sixth and Fourteenth Causes of Action; (e) Seventh and

38

Fifteenth Causes of Action; and (f) Eighth and Sixteenth Causes of Action.

In their Brief, Appellants argue that the absolute privilege does not apply because Disson was not a party to the NBC Action, Disson Skating argued that it was not a proper party to the NBC Action, and Disson Skating had not yet filed any papers in that action when Disson allegedly made the purported defamatory statements. The Court should reject these arguments for multiple reasons.

**First**, it is clear from both the Daily News and the Post articles that Disson was speaking on behalf of his company and spoke about his company's dealings with Baiul. (A-1099-1103, 1105). The Daily News article (A-1099-1103) states that Disson Skating is the defendant, not Disson. This article also stated "Stephen Disson said his company never publically disclosed his negotiations to have Baiul appear." The Post article (A-1105) states that Baiul sued a "skating promoter," and Appellants do not argue that Disson, as opposed to his company, was the "skating promoter."

**Second**, this "privilege is extended to all pertinent communications among the parties, counsel, witnesses, and the court." *Sexter & Warmflash, P.C. v. Margrabe*, 38 A.D.3d 163, 174 (1st Dept 2007). Here, Disson is clearly a witness to the events from which Baiul's claims allegedly arose in the NBC Action. Furthermore, even though Disson Skating argued that it was not a proper party in the NBC Action, the simple fact remains that it was a party to that action and was forced to defend itself.

**Third**, the litigation privilege extends to agents of a party, for example, an

39

attorney writing on behalf of his client when that attorney was not a party to the underlying dispute or litigation. *See Vodopia v. Ziff-Davis Pub. Co.*, 243 A.D.2d 368, 368 (1st Dep't 1997). The same holds true for statements by an employee of a party to the underlying proceeding.[5] Here, it is not disputed that Disson was an agent, employee and officer of Disson Skating. (A-6, Docket No. 29 at ¶ 4). **Fourth**, the privilege extends to statements that a party makes about a lawsuit before that party has filed a single paper in such lawsuit.[6]

_____

[5] *See Friedman v. Alexander*, 79 A.D.2d 627, 628 (2d Dep't 1980) ("As a member of a creditors' committee of the bankrupt and as the president of a creditor of PICO, he was, indeed, an interested party."); *see also Mosesson v. Jacob D. Fuchsberg Law Firm*, 257 A.D.2d 381 (1st Dep't 1999) (Holding that the privilege extended to employees of a party to the underlying litigation).

[6] *See Hudson v. Goldman Sachs & Co., Inc.*, 304 A.D.2d 315, 315-316 (1st Dept 2003) ("Plaintiff's cause of action for defamation was interposed by amendment after a newspaper article about this lawsuit reported that unnamed employees of defendant were saying that defendant terminated plaintiff not for having an extramarital affair with a co-employee but for denying the affair when his superiors asked him about it, thereby allegedly impugning plaintiff's honesty. *** Nothing about Civil Rights Law § 74 suggests that a person served with a summons and complaint should not feel free and safe to announce its position, and otherwise make its first response to the allegations against it, in a forum other than court."). The lower court opinions for this case describe the alleged defamatory statement as one describing plaintiff as being dishonest for lying about an extra-marital affair. *See Hudson v. Goldman Sachs & Co.*, No. 600502/00, 2002 WL 34338583, * 1 (Sup. Ct. N.Y. Co. Apr. 3, 2002) ("In his amended complaint, plaintiff also sought recovery for the common law torts of libel and slander. Specifically, when the controversy came to the attention of the New York Times, a source at Goldman told the newspaper, which reported the contention, that plaintiff had been terminated not for having an affair, but for lying about it, thus impugning plaintiff's honesty."); *see also Hudson v. Goldman Sachs & Co*, No. 600502/00, 2000 WL 35928688 (Sup. Ct. N.Y. Co. Dec. 18, 2000); *Vodopia v. Ziff-Davis Pub. Co.*, 243 A.D.2d 368 (1st Dept 1997) ("Plaintiff's defamation cause of action, which is premised

Consequently, Appellants have not put forth a viable argument as to why New York's litigation privilege does not bar the above-referenced causes of action, and those claims were properly dismissed.

## Pennsylvania Law

Pennsylvania's litigation privilege for extra-judicial statements – the fair report privilege – would bar the above-referenced claims as well. As one Pennsylvania Court held:

> [S]tatements about [judicial proceedings] made outside the judicial proceedings are subject to a qualified privilege only; the burden is on the plaintiff to show that defendant abused its privilege. *** The Pennsylvania Supreme Court has recognized that '[i]f the ... account is fair, accurate and complete, and not published solely for the purpose of causing harm to the person defamed, it is privileged and no responsibility attaches, even though information contained therein is false or inaccurate.'

*Oweida v. Tribune-Review Pub. Co.*, 599 A.2d 230, 233-34 (Pa. Super. Ct 1991).

Furthermore, for the alleged defamatory statement to be protected by such privilege, such statements do not have to "contain a verbatim recitation of the subject matter being reported on; it simply requires that the account provide a substantially accurate summary." *Hudak v. Times Pub. Co., Inc.*, 534 F.Supp.2d 546, 560 (W.D. Pa. 2008)

---

upon the contents of a letter written by opposing counsel and sent to plaintiff and directly to plaintiff's client during the course of negotiations to settle a copyright lawsuit threatened by plaintiff's client, was properly dismissed by the court on the ground that the letter was absolutely privileged."); *cf. Sexter & Warmflash, P.C. v. Margrabe*, 38 A.D.3d 163, 174 (1st Dep't 2007) ("Whether a statement was made in or out of court, was on or off the record, or was made orally or in writing, the rule is the same—the statement, if pertinent to the litigation, is absolutely privileged.).

41

(quotations omitted). This privilege applies equally to persons who make alleged defamatory statements to the press.[7] Furthermore, this privilege applies to alleged defamatory statements made prior to the party filing papers in Court.[8]

Here, as demonstrated above, Disson's alleged defamatory statements that serve as the basis of Appellants' First and Ninth Causes of Action, Second and Tenth Causes of Action, Third and Eleventh Causes of Action, Sixth and Fourteenth Causes of Action, Seventh and Fifteenth Causes of Action, and Eighth and Sixteenth Causes of Action are all substantially accurate summaries of Disson Skating's position in the NBC Action.

Additionally, there is simply no evidence in the record that Disson made these statements solely for the purpose of causing harm to Baiul. Disson was merely defending his company against a lawsuit filed by Baiul that the media was covering and

---

[7] *See Pelagatti v. Cohen*, 536 A.2d 1337, 1344 (Pa. Super. Ct. 1987) ("[I]nvolved parties, witnesses, and counsel are permitted to make remarks to the press relative to proceedings, and no responsibility will attach, even if the contents of articles or remarks are false or defamatory, provided the articles and/or remarks were not published solely for the purpose of causing harm."); *see also Richmond v. McHale*, 35 A.3d 779, 786 (Pa. Super. Ct. 2012) (holding same).

[8] *See Davis v State Farm Ins.*, No. 11-CV-3401, 2012 WL 6524120, * 6 (E.D. Pa. Dec. 14, 2012) (holding that a party's statement to law enforcement prior to a party bringing criminal charges was protected under the judicial privilege); *Pawlowski v. Smorto*, 588 A2d 36, 42 (Pa. Super. Ct. 1991) ("'A party to a private litigation or a private prosecutor or defendant in a criminal prosecution is absolutely privileged to publish defamatory matter concerning another in **communications preliminary to a proposed judicial proceeding**, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.'")(quoting Section 587 of the Restatement (Second) of Torts)(emphasis supplied).

he only spoke in response to an inquiry by the press.  (A-166 at ¶¶ 115-117; A-954).  As a matter of law, merely stating one's legal position "with some spiced up language" is not a publication made solely to harm a defamation plaintiff.  *First Lehigh Bank v. Cowen*, 700 A.2d 498, 508 (Pa. Super. Ct. 1997).  Moreover, Appellants have failed to come forth with any evidence that Disson had any personal ill will towards Baiul or a possible reason to harm her, which is necessary to establish that Disson made these statements solely to harm Baiul.[9]

Therefore, Pennsylvania's litigation privilege bars the above-referenced defamation causes of action, and they were properly dismissed.

## POINT III

### MANY OF THE CLAIMS ARE BASED UPON ALLEGED EXPRESSION OF OPINION OR RHETORICAL HYPERBOLE

A defamation claim should be dismissed if it arises from a statement of opinion. *See Howard v. Alford*, 229 A.D.2d 996, 997 (4th Dep't 1996) ("[B]ecause the statement was an expression of defendant Alford's opinion of plaintiff's efforts as an employee of AM & A, it is constitutionally protected (*see, Miller v. Richman*, 184 A.D.2d 191, 193, 592 N.Y.S.2d 201; *Williams v. Varig Brazilian Airlines*, 169 A.D.2d 434, 438, 564 N.Y.S.2d 328, lv. denied 78 N.Y.2d 854, 573 N.Y.S.2d 467, 577 N.E.2d 1059).");

---

[9]    *See Friedman v. Israel Labour Party*, 957 F.Supp. 701, 715 (E.D. Pa. 1997) ("Plaintiff offers no evidence that anyone involved personally knew plaintiff or had any possible reason to want to harm him. Plaintiff has not, therefore, raised any genuine issues of material fact that the material was published solely to harm him.").

*Rosenthal v. Roberts*, No. 102603/04, 2005 WL 3334272, * 1 (Sup. Ct. N.Y. Co. Oct. 11, 2005) ("The court shall grant defendants' motion to dismiss this defamation action because the statements alleged to be defamatory constitute protected opinion in the context of a highly charged union election."); *Penn Warranty Corp. v. DiGiovanni*, 10 Misc 3d 998, 1005 (Sup. Ct. N.Y. Co. 2005) ("Perhaps most compelling however, is the fact that the web site, when viewed in its full context, reveals that defendant is a disgruntled consumer and that his statements reflect his personal opinion based upon his personal dealing with plaintiff. They are subjective expressions of consumer dissatisfaction with plaintiff and the statements are not actionable because they are defendant's personal opinion.").

Furthermore, a statement that is a mere rhetorical hyperbole is not actionable. *See Stroup v. Nazzaro*, 91 A.D.3d 1367, 1368 (4th Dep't 2012) ("Defendant's statement that plaintiff was an 'abuser,' viewed in the context of the heated incident on the bus, amounted to no more than name-calling or a general insult, a type of epithet not to be taken literally and not deemed injurious to reputation."); *Depuy v. St. John Fisher Coll.*, 129 A.D.2d 972, 972 (4th Dep't 1987) ("[R]eference to plaintiff as a 'clown' amounted to no more than name-calling or a general insult, a type of epithet not to be taken literally and not deemed injurious to reputation. A certain amount of vulgar name-calling is tolerated, on the theory that it will necessarily be understood to amount to nothing more. We conclude that in the context in which the statement was made, it

44

was not susceptible of a defamatory meaning and was not actionable.")(citations and quotations omitted); *Ram v. Moritt*, 205 A.D.2d 516 (2d Dept 1994) ("The plaintiff charges that the associate called the plaintiff a "liar", a "cheat", and a "debtor" in the presence of patients in the doctor's waiting room. Our review of the statements convinces us that they were not reasonably susceptible of a defamatory meaning, but rather constituted personal opinion and rhetorical hyperbole rather than objective fact, and thus were constitutionally protected.").

Additionally, a general criticism of a plaintiff's professional performance is not actionable. *See Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985) ("The mere expression of unhappiness with plaintiff's fulfilling her duties as a legislative assistant is not libelous per se."); *Howard*, 229 A.D.2d at 997 (holding same). (*See* discussion *supra* at POINT IV for a discussion as to Baiul's lack of special damages.).

The law in Pennsylvania on these issues is the same as New York.[10]

_____

[10]     *See Smith v. Garber*, No. 03-1424, 2003 WL 21960720, * 2 (E.D. Pa. June 25, 2003) ("[B]eing referred to as a 'kook' ... is not reasonably capable of a defamatory meaning, and is not actionable."); *Fetter v. N. Am. Alcohols, Inc.*, No. 06-4088, 2007 WL 551512, *12 (E.D. Pa. Feb. 15, 2007) ("The alleged statements to the effect that the plaintiff was greedy, unreasonable, or foolish reflect personal opinion and therefore do not constitute defamation."); *Sheehan v. Anderson*, No. 98-5516, 2000 WL 288116, * 2 (E.D. Pa. Mar. 17, 2000) ("The court finds that Anderson's statements, which concern Sheehan's job performance rather than his fitness or ability to perform his job, are not capable of defamatory meaning."), *aff'd*, 263 F3d 159 (3d Cir 2001); *Kryeski v. Schott Glass Tech., Inc.*, 626 A.2d 595, 601 (Pa. Super. Ct. 1993) ("[T]he alleged statements by one employee to another that appellant was "crazy" were not defamatory."); *Wendler v. DePaul*, 499 A.2d 1101, 1103 (Pa. Super. Ct. 1985) ("While appellant's job performance was criticized, he was not accused of dishonesty or anything else that

Here, Appellants allege defamation claims based upon alleged statements that Baiul's NBC Action is "weird," Baiul was a "little flaky," Baiul "was grateful for a third chance," and Baiul previously performed "poorly." Even though Disson denies that he made these statements (A-350-354; A-167-168 at ¶¶ 125, 129 and 132), such alleged statements would constitute mere opinion, rhetorical hyperbole and/or a general criticism of Baiul's professional performance.

Therefore, the District Court properly dismissed Appellants' (a) Second and Tenth Causes of Action; (b) Third and Eleventh Causes of Action; (c) Fourth and Twelfth Causes of Action; and (d) Sixth and Fourteenth Causes of Action.

## POINT IV

### THE ALLEGED STATEMENT THAT BAIUL ONCE DID NOT SHOW UP BECAUSE SHE WAS SHOPPING IS BARRED BY THE SINGLE INSTANCE RULE

An alleged defamatory statement that accuses plaintiff of a single dereliction of plaintiff's professional duties is not actionable without proof of special damages:

> Defendant Rogers' statement that plaintiff 'fucked up the case' is one that would tend to disparage or injure her in her profession. However, it falls within the purview of New York's "single instance rule"—a narrow exception to this category of defamation per se—and thus is not actionable absent a showing of special damages. The "single instance rule" applies where a defamatory statement accuses plaintiff of a single dereliction in connection with his profession. A statement identifying a single professional error in judgment does not amount to an accusation of general

_____

would 'blacken [his] reputation or [ ] expose him to public hatred, contempt, or ridicule.'").

46

incompetence, ignorance or lack of skill and is therefore not deemed actionable unless special damages are pleaded and proven.  This rule is in place because New York recognizes the human tendency to err, and that, therefore, to state that a professional person has erred in a particular instance would not presumptively cause damage to that person in his business or profession, because such statement would imply no more than that the person was human.

*Hussey v. New York State Dept. of Law/Off. of Atty. Gen.*, 933 F.Supp.2d 399, 415 (E.D.N.Y. 2013) (internal quotations, citations, brackets and ellipses omitted); *see also Larson v. Albany Med. Ctr.*, 252 A.D.2d 936, 939 (3d Dep't 1998) ("The statements involved alleging that plaintiffs were insubordinate or engaged in unprofessional conduct are subject to the single instance exception because such charges did not suggest that plaintiffs were incompetent as nurses.").

Additionally, a plaintiff fails to prove special damages when plaintiff "fail[s] to itemize" his/her damages as to the alleged defamatory statement, because such is "deemed a representation of general damages and these are legally insufficient."  *See Larson*, 252 A.D.2d at 939; *see also Drug Research Corp. v. Curtis Pub. Co.*, 7 N.Y.2d 435, 441 (1960) ("The damage claimed is $5,000,000. Such round figures, with no attempt at itemization, must be deemed to be a representation of general damages. It is an established rule in New York that a libel on the product is actionable by the manufacturer only if special damages are alleged ....") (citations omitted).

Here, Appellants' Fifth and Thirteenth Causes of Action are based upon Disson's alleged statement to the New York Daily News that: "One time, she didn't show up.  She

47

was out shopping ...." (A-6, Docket No. 6 at ¶¶ 91 and 179). While Disson denies making this statement, not showing up for work one time is an accusation of a single dereliction in connection with Baiul's profession, and is thus covered by the "single instance rule."

Furthermore, Baiul has failed to establish special damages for this claim, because she fails to prove damages specific to this alleged defamatory statement. (A-173 at ¶¶ 163-166; A-910-911; A-920-921; A-678-682 [262:9 to 266:20]; A-628-630 [386:7 to 389:3]; A-637-640 [395:7 to 398:22]).

In their Reply Brief, we expect Appellants to argue that New York's single instance rule does not bar these claims because this alleged statement is somehow tied to Disson's alleged statements that Baiul previously performed "poorly" and was "grateful for a third chance." However, Appellants alleged these statements separately in separate causes of action, thus each cause of action stands alone.

These claims should also be dismissed under Pennsylvania law because Disson's citing to a *single* incident of her job performance is, as a matter of law, not defamatory.[11]

_____

[11]    *See Cashdollar v. Mercy Hosp. of Pittsburgh*, 595 A.2d 70, 75 (Pa. Super. Ct. 1991) ("The letter does not attribute a lack of ability which would tend to harm Cashdollar in his profession. It comments only on Mercy's evaluation of Cashdollar's performance in the context of his employment at that institution and states the reasons for his dismissal. Therefore, we find that the letter was not defamatory on its face."); *Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc.*, 261-62, 489 A.2d 1364, 1368-69 (Pa. Super. Ct. 1985) ("We agree with the lower court which held that the words complained of by appellant bear no reasonable interpretation which would render them defamatory. The phrases 'a vote of no confidence', 'lack of trust in the reporting ability

48

Therefore, the Court should affirm the dismissal of Appellants' Fifth and Thirteenth Causes of Action.

## POINT V

### BAIUL IS A PUBLIC FIGURE AND FAILED TO PROVE ACTUAL MALICE

"'Whether or not a person ... is a public figure is a question of law for the court to decide.' *Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F.Supp. 661, 666 n. 3 (S.D.N.Y.1991)." *Biro v. Conde Nast*, No. 11 CIV. 4442, 2013 WL 3948394, * 11 (S.D.N.Y. Aug. 1, 2013) (Oetken, J.). If plaintiff is a public figure, he/she must establish actual malice in order to have a viable defamation claim. *See Kolchinsky v. Moody's Corp.*, No. , 2012 WL 639162, * 4 (S.D.N.Y. Feb. 28, 2012) (Crotty, J.) ("Where the plaintiff is a public figure, a complaint must allege that the defendant made the defamatory statement with actual malice."). A Court "evaluate[s] whether a party is a public figure based on clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society." *Dongguk Univ. v. Yale Univ.*, No. 12-2698-CV, 2013 WL 4106644, *7 (2d Cir. Aug. 15, 2013).

"Actual malice" must be proven by clear and convincing evidence. *See Biro*, 2013 WL 3948394, * 16. "Actual malice" means a "deliberate or reckless

---

of [appellant]', 'lack of confidence in [appellant's] work', and '[appellant's] attitude and performance over the past several years ... [indicates] ... a vote of 'no confidence', if believed, do not impute a charge of incompetency or unfitness.").

49

falsification," and recklessness must be established by evidence that "the defendant in fact entertained serious doubts as to the truth of his publication." *Id.*

Here, it cannot be credibly disputed that Baiul is a public figure. She is a world-famous figure skater who won the 1993 World Championship, Ladies Figure Skating, at the age of 15 years old and became the 1994 Olympic Gold Medalist, in Ladies Figure Skating. (A-148-149 at ¶ 1; A-943; A-6, Docket No. 29 at ¶ 2). Baiul also considers herself the "queen of the ice," a "superstar" and a "global entertainer." (A-624 [382: 7-8]; A-643 [424: 11-21]).

Thus, for all of the alleged defamatory statements, Baiul must prove that Disson knew the statement he was making was false or entertained serious doubts as to the truth of his statements. In her deposition, Baiul admitted that she has no evidence as to the subjective intent or knowledge of Disson with regard to any of the alleged statements for her defamation claims. (A-646-647 [427:20 to 428:20]; A-612-613 [370:21 to 371:14]; A-565-566 [292:3 to 293:8]; A-612 [370:5-14]; A-573-574 [315:4 to 316:4]; A-577 [329:11-23]; A-611-612 [369:5-370:4]; A-586-587 [338:11 to 339:2]; A-610-611 [368:10 to 369:4]; A-595 [353:5-13]; A-609-610 [367:23 to 368:9]; A-600-601 [358:21 to 359:2]; A-607-609 [365:24 to 367:3]; A-613-614 [371:23 to 372:21]; A-619 [377:3-8]; A-621-622 [379:14 to 380:11]).

Specifically, as to the defamation claims concerning whether Disson PA publicly announced, promoted or advertised that Baiul was going to be in the Disson shows (1st,

50

7th, 8th, 9th, 15th, and 16th Causes of Action), Disson believed, with good reasons, that (a) Disson and Disson PA never publicly used Baiul's name and likeness (*see* discussion *supra*); (b) Baiul agreed to do the Disson shows (A-257 [58:5-15], A-267-269 [68:3 to 70:2]; A-269 [70:11-13]; A-269-270 [70:16 to 71:13]; A-273-275 [74:25 to 76:3]; A-267-277 [77:9 to 78:19]; A-286 [87:18-21]; A-308 [172:4-11]; A-309-310 [173:4 to 174:3]; A-315-316 [179:22 to 180:17]); and (c) Baiul then backed out of these shows (A-295-296 [146:15 to 147:12]; A-297 [148:2-6]; A-367-268 [256:23 to 257:2]).

As to the alleged statement "[o]ne time, she didn't show up. She was shopping ..." (5th and 13th Causes of Action), which Disson denies making, Disson had prior, personal knowledge of Baiul not showing up on time for a dress rehearsal because she was shopping – facts that he personally witnessed. (A-169 at ¶¶ 140-141; A-957 at ¶¶ 140-141; A-237 [203:5-11]; A-340 [224:7-13, 224: 16-21]; A-340-341[ 224:24 to 225: 5]; and A-355-356 [244:23 to 245:6]). In fact, Baiul admits that (a) her former agent, David Baden of IMG, heard the same facts with regard to her not showing up for a rehearsal as described by Disson (A-169 at ¶ 142; A-957; and A-588 [340:5-20]); and (b) prior to 2011, it was gossip in the skating business that Baiul missed an event because she was out shopping (A-169 at ¶143 and A-589-590 [341:10 to 343:4]).

With regard to the alleged statements of "weird," a "little flaky," "grateful for a third chance," and performing "poorly" (2nd, 3rd, 4th, 6th, 10th, 11th, 12th, and 14th Causes of Action), such terms clearly have ambiguous and subjective meanings. These

statements are rhetorical hyperbole, and as such, are "not to be taken literally." *Stroup*, 91 A.D.3d at 1368; *Depuy*, 129 A.D.2d at 973.  Hence, there is simply no way that Baiul could prove, by clear and convincing evidence, the subjective intent of the person making such statements.

Accordingly, Baiul has failed to prove actual malice for any of the alleged defamatory statements and her Amended Complaint was properly dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Disson Skating and Disson respectfully request that

the Court affirm the District Court's dismissal of the Amended Complaint.

Dated:          New York, New York
                November 20, 2014

                                    Yours, etc.,
                                    TACOPINA SEIGEL & TURANO, P.C.


                        By:      /s/ Joseph Tacopina
                                Joseph Tacopina, Esq.
                                Matthew G. DeOreo, Esq.
                                275 Madison Ave., Fl. 35
                                New York, New York 10016
                                Tel: (212) 227-8877
                                Fax: (212) 619-1028
                                *Attorneys for Defendants-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that in compliance with the Federal Rules of Appellate Procedure, Appellees' Brief is in 14 point Times New Roman typeface and is 13,242 words calculated by Word Perfect, a word processing program.

Dated:      New York, New York
               November 20, 2014

                                Yours, etc.,
                                TACOPINA SEIGEL & TURANO, P.C.

                      By:       /s/ Joseph Tacopina
                                Joseph Tacopina, Esq.
                                Matthew G. DeOreo, Esq.
                                275 Madison Ave., Fl. 35
                                New York, New York 10016
                                Tel: (212) 227-8877
                                Fax: (212) 619-1028
                                *Attorneys for Defendants-Appellees*